UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:12-cr-00381-FDW-DCK

| | |
|---|---|
| UNITED STATES, ) | |
| ) | |
| vs. ) | |
| ) | ORDER |
| JARVIS FORNEY, ) | |
| ) | |
| Defendant. ) | |
| ) | |

THIS MATTER is before the Court on Defendant's Motion to Suppress (Doc. No. 10). The Government responded to the motion (Doc. No. 11), and on February 27, 2013, the Court conducted a hearing and received evidence on the motion. Following the hearing, the Court requested supplemental briefing, which both parties have submitted (Docs. Nos. 14, 15, 16). This matter is now ripe for ruling. For the reasons that follow, Defendant's motion is DENIED.

**I. BACKGROUND**

The facts surrounding the traffic stop are largely uncontested, and a digital motor vehicle recording from a patrol car captured the majority, if not all, of the traffic stop and the events in question. The Court admitted the digital motor vehicle recording into evidence as Exhibit 1 at the hearing on this matter.

On July 25, 2012, Officer Gregory Dunston with the Charlotte Mecklenburg Police Department was sitting stationary in his patrol car facing an intersection in a residential area in Charlotte. Officer Dunston observed a gray Cadillac drive through the stop sign at the intersection and fail to come to a complete stop. Defendant was the driver of the Cadillac. Officer Dunston then initiated a traffic stop by turning on his blue lights and engaging his sirens. The time stamp on the digital recording of the traffic stop in Officer Dunston's car read 20:53:33

at the time the blue lights were initiated. The Cadillac subsequently turned around in the cul-de-sac and stopped, facing Officer Dunston's police car. While the Cadillac was facing him, Officer Dunston observed the passenger move around and "dip really low in his seat . . . [b]asically slid down in the seat . . . [h]is whole upper body just dipped really low in the seat." (Tr. p. 6). Defendant does not dispute Officer Dunston's testimony or his description of the passenger's behavior. Based on this swift movement, Officer Dunston testified that he "jumped out of the car . . . and went straight to the vehicle." (Tr. p. 29). He did so in order to "put eyes on the hands in the vehicle, just to make sure I could see what was going on in the vehicle." (Tr. p. 13).

When Officer Dunston approached the Cadillac at 20:53:58, he asked for Defendant's identification, the passenger's information, and the car's registration information. The officer also informed Defendant that he was stopped for running a stop sign. After Defendant and the passenger handed over their identification, Officer Dunston returned to his vehicle and repositioned his patrol car so that it was behind the Cadillac. According to the digital recording of the traffic stop from Officer Dunston's patrol car, it took less than two minutes from the time the officer initiated the traffic stop, approached the Cadillac, obtained the identification information, returned to his patrol car, and relocated the patrol car behind the Cadillac.

While moving his patrol car around 20:55:00, Officer Dunston called the police department's dispatch to report the stop. Officer Dunston testified that he normally makes this call prior to approaching a stopped vehicle; however, because of the suspicious movement from the passenger, he immediately exited his vehicle in order to observe inside the vehicle. During the call into the police department, Officer Dunston also requested backup because of the suspicious movement of the passenger. After the call to the police dispatch, Officer Dunston

2

remained in his vehicle for the next five minutes while his patrol car computer returned information on the driver's license and vehicle registration.

Officer Dunston's computer in his car returned information that Defendant's driver's license was suspended for failure to appear in court.[1]  Officer Dunston testified that "After – after I ran his information for his license and it did return it [sic] suspended, and I looked at his driving record, [I] already knew that he was going to be under arrest. . . .  When I read it on the computer screen I knew – right after I saw the information, that's when [Defendant] was going to be arrested." (Tr. pp. 34-35).

After receiving the information on Defendant's driver's license and the information on the passenger and the vehicle, Officer Dunston learned that the requested backup officer was "close by." (Tr. p. 16).  At this time but prior to the arrival of the backup officer, Officer Dunston first approached the vehicle on the passenger's side and requested the passenger to exit the car.  According to the time stamp of 21:00:00 on the digital recording of the traffic stop, approximately seven minutes had elapsed since the time Officer Dunston initiated the traffic stop by engaging his blue lights.  Officer Dunston informed the passenger that he had observed him

---

[1] Defendant contends that, at the time, his driver's license was not suspended.  In addition to Officer Dunston's testimony that the computer screen in his patrol car said "license suspended" and "failure to appear," (Tr. p. 35), the government provided the Court with a certified copy of Defendant's driver event history (Doc. No. 14-1).  That document indicates that at the time of the stop, Defendant's driver's license appeared in the North Carolina Driver License System as being suspended for failure to appear.  Notations to this document indicate that such status was entered in error.  The correct status, which changed the suspension to "valid," was not entered into the North Carolina Driver License System until August 1, 2012, after the traffic stop.  While this is a mistake in fact, it does not constitute a mistake in law, and the Court finds that based upon the data in the Driver's License System, Officer Dunston's belief that Defendant's license was suspended is objectively reasonable.  See David J. Stucky, The Tenth Circuit's Obscured Vision: Losing Sight of the Importance of Requiring Clearly Visible License Plates (United States v. Edgerton, 438 F.3d 1043 (10th Cir. 2006)), 46 Washburn L.J. 633, 662 (2007) ("As a general rule, most circuits have held that a traffic stop rooted in a mistake of fact may be found objectively reasonable, whereas a stop premised on a mistake of law is never legal.  See, e.g., United States v. Miguel, 368 F.3d 1150, 1153 (9th Cir. 2004); United States v. Chanthasouxat, 342 F.3d 1271, 1279 (11th Cir. 2003). The Tenth Circuit has followed this view.  See, e.g., United States v. Tibbetts, 396 F.3d 1132, 1138 (10th Cir. 2005).").

slouch or slide down in the seat and questioned the passenger as to why he made that movement. Officer Dunston then obtained the passenger's consent to search his person and, according to the digital motor vehicle recorder, began such search at approximately 21:01:39. This was approximately eight minutes into the traffic stop. Officer Dunston testified that he conducted this search for purposes of officer safety. (Tr. p. 19).

Officer Quentin Blakeney arrived at the scene at approximately 21:03:29 or about ten minutes from the time that Officer Dunston initiated the traffic stop. About a minute later at 21:04:35, Officer Dunston approached Defendant on the driver's side of the vehicle, requested Defendant to exit the vehicle, and informed him that his license was suspended for failure to appear in court. Defendant stated that his license was not suspended. For the next few minutes, the video indicates that Officer Dunston repeatedly asked Defendant whether there was any contraband in the car and told Defendant if he was honest, then the officers "will work with you." Defendant refused to answer the question and instead kept turning the conversation back to his contention that his license was not suspended. This exchange occurred from 21:05:57 until 21:07:59, when Defendant affirmatively responded that there was a "firearm" in the vehicle. Defendant admitted the firearm was not registered and also stated "it ain't dirty or nothing." Officer Dunston testified that he understood Defendant to be saying the firearm was not stolen.

Officer Dunston subsequently looked for the firearm in the vehicle at 21:09:37 and located an assault rifle on the backseat under a black bag. (Tr. p. 27). Officer Dunston called the firearm into dispatch and learned that the gun was stolen. During this time, a third officer – Officer Schneider – arrived on the scene. Around 21:22:05, approximately twenty-nine minutes after the officer initiated the stop, Officer Dunston placed Defendant in handcuffs and informed

4

him that he was under arrest. The video indicates Officer Dunston specifically informed Defendant he was under arrest for two reasons: "First of all you're suspended, man. And then, that gun is stolen."

The Government indicted Defendant for possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). Defendant subsequently filed a motion to suppress claiming: (1) he was unlawfully detained beyond the scope of the traffic stop, (2) any statements made by Defendant at the scene of the traffic stop were in violation of <u>Miranda v. Arizona</u>, 384 U.S. 444 (1966), (3) the warrantless search of his car was unlawful, (4) his arrest was unlawful, and (5) post-arrest statements made by him after waiving his Miranda rights are tainted by the previously described alleged violations. On February 27, 2013, the Court conducted a hearing and received evidence, including the testimony of Officer Dunston. Following the hearing, the Court requested supplemental briefing, which concluded on March 17, 2012, when both parties submitted supplemental briefs.

## II. ANALYSIS

The issue before the Court is whether the stop of Defendant and subsequent seizure of the firearm comports with constitutional protections guaranteed under the Fourth Amendment. Defendant argues the traffic stop and subsequent seizure of the firearms were unconstitutional because the officers prolonged the traffic stop beyond the appropriate scope and duration permitted under law.

Defendant's motion to suppress implicates the Fourth Amendment's protections against unreasonable searches and seizures. The Fourth Circuit has recently explained the applicable law in cases involving issues about the limitations of a traffic stop:

5

The "[t]emporary detention of individuals during the stop of an automobile by police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." Whren v. United States, 517 U.S. 806, 809–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Because an ordinary traffic stop is "a limited seizure more like an investigative detention than a custodial arrest," we employ the Supreme Court's analysis for investigative detention used in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), to determine the limits of police conduct in routine traffic stops. United States v. Rusher, 966 F.2d 868, 875 (4th Cir.1992).

Under Terry's "dual inquiry," after asking whether the officer's action was "justified at its inception," Rusher, 966 F.2d at 875, we ask whether the continued stop was "sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." Florida v. Royer, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion). With regard to scope, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." Id. With regard to duration, although the reasonable duration of a traffic stop "cannot be stated with mathematical precision," United States v. Branch, 537 F.3d 328, 336 (4th Cir. 2008), a stop may become "unlawful if it is prolonged beyond the time reasonably required to complete [its] mission." Illinois v. Caballes, 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005). Thus, we evaluate "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." United States v. Sharpe, 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). To prolong a traffic stop "beyond the scope of a routine traffic stop," an officer "must possess a justification for doing so other than the initial traffic violation that prompted the stop in the first place." Branch, 537 F.3d at 336. This requires "either the driver's consent or a 'reasonable suspicion' that illegal activity is afoot." Id.

. . . .

Similarly, the officer may "inquir[e] into matters unrelated to the justification for the traffic stop," Arizona v. Johnson, 555 U.S. 323, 333, 129 S.Ct. 781, 788, 172 L.Ed.2d 694 (2009) . . . only "so long as those inquiries [or other actions] do not measurably extend the duration of the stop." Johnson, 129 S.Ct. at 788.

United States v. Guijon-Ortiz, 660 F.3d 757, 764-65 (4th Cir. 2011).

**A. Scope and Duration of the Traffic Stop**

Here, the parties agree the traffic stop was justified in its inception. It is uncontested that

Defendant failed to come to a complete stop at the stop sign, which is a traffic violation under North Carolina law. The inquiry thus turns to determining the propriety of the scope and duration of the stop, and, if Officer Dunston extended the scope and duration, whether he had reasonable suspicion to do so.

      1.      Propriety of Scope and Duration

Unquestionably, the first seven minutes of Officer Dunston's stop involved normal investigative steps related to the initial reason for the stop – Defendant's failure to stop at the stop sign. "A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation. The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop. Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave." Arizona v. Johnson, 555 U.S. 323, 333, 129 S. Ct. 781, 788, 172 L. Ed. 2d 694 (2009) (citation omitted).

During those first seven minutes, Officer Dunston obtained the computer information regarding Defendant's driver's license and the passenger's identification. As a result of these normal investigative procedures, Officer Dunston learned that Defendant's driver's license was suspended. At this point, and because of the flow of events directly related to the initial reason for the stop, the stop became somewhat of a hybrid investigation related to (1) handling the initial reason for the stop (running the stop sign), (2) determining the nature of the suspended license, and (3) resolving the suspicious behavior observed by Officer Dunston as he initiated the traffic stop. The Court notes that throughout the traffic stop, Officer Dunston did not conclusively resolve the stop sign violation, which was the initial reason for the stop. He neither

7

issued Defendant a citation nor informed Defendant such citation would not be issued, thus leaving the resolution of the stop sign violation open for the duration of the traffic stop.

Once Officer Dunston received the computer information on the driver's license, passenger identification, and vehicle registration, the officer, continuing with normal investigative procedures, returned to the vehicle and requested the passenger exit the vehicle. "[A] police officer may as a matter of course order the driver of a lawfully stopped car to exit his vehicle." Maryland v. Wilson, 519 U.S. 408, 410, 117 S. Ct. 882, 137 L. Ed. 2d 41 (1997) (citing Pennsylvania v. Mimms, 434 U.S. 106, 98 S. Ct. 330, 54 L. Ed. 2d 331 (1977) (*per curiam*)). That rule, the justification for which is officer safety, extends to passengers, as well. Wilson, 519 U.S. at 414-15, 117 S. Ct. 882." United States v. Vaughan, 700 F.3d 705, 710 (4th Cir. 2012).

During the course of a routine traffic stop, a law enforcement officer's "questions or actions . . . need not be solely and exclusively focused on the purpose" of the initial stop. United States v. Mason, 628 F.3d 123, 131 (4th Cir.2010); see also United States v. Grillo, 40 F.3d 1245 (4th Cir. 1994) (unpublished) ("'[W]e reject any notion that a police officer's questioning, even on a subject unrelated to the purpose of the stop, is itself a Fourth Amendment violation. . . . [D]etention not questioning, is the evil at which Terry's second prong is aimed.'") (quoting United States v. Shabazz, 993 F.2d 431, 436 (5th Cir.1993). Moreover, if the driver obstructs a police officer's efforts, a longer traffic stop would not be unreasonable. See United States v. Sharpe, 470 U.S. 675, 687-88, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985) (noting a twenty-minute traffic stop was a reasonable Terry stop when police acted diligently and reasonably).

Here, it is uncontested that Officer Dunston was concerned about officer safety,

particularly after seeing the passenger suspiciously slide down in the seat as the car was being stopped for running the stop sign. Notably, Defendant does not argue or dispute that the passenger did not dip down low or slide down in his seat. As a result, Officer Dunston requested the passenger to exit the vehicle. The passenger complied and voluntarily consented to a search of his person. This took less than five minutes. For similar reasons, Officer Dunston asked Defendant to exit the vehicle. Officer Dunston then questioned Defendant about whether there was any contraband in the vehicle. Defendant did not provide an immediate response to this question and instead kept asserting that his license was not suspended, thus thwarting the officer's ability to quickly resolve his concerns with the presence of a firearm in the vehicle. Because Defendant initially dodged Officer Dunston's questions pertaining to contraband in the car, the Court finds Defendant's conduct to have prolonged the stop. Officer Dunston persisted in trying to get Defendant to answer his question, and in little over three minutes of being questioned by Officer Dunston, Defendant admitted he had an unregistered firearm in the vehicle. Only fifteen minutes elapsed from the time Officer Dunston initiated the traffic stop to the time Defendant indicated that a firearm was located within the vehicle.

The Court finds that the removal and brief questioning of both the passenger and Defendant, all of which occurred within the first fifteen minutes of the stop, did not unduly exceed the scope or prolong the duration of the stop. Defendant admitted that an unregistered firearm was located in the back of the vehicle occurred at 21:07:59. After Defendant admitted to the presence of a weapon in the vehicle, the officers were permitted to secure the weapon and check the registration information. The Fourth Circuit has recognized that once an officer has knowledge of the existence of a firearm, the officer may search the vehicle to secure the weapon.

9

See United States v. Carico, 311 F. Appx. 572, 574 (4th Cir. 2008) (unpublished) (citing United States v. Elson, 479 F.3d 314, 320 (4th Cir. 2007)). The remaining fourteen minutes before Defendant was arrested are largely attributed to the officer's verification of the legality of that firearm. Of this time, it took almost ten minutes to receive a status of the gun, a period of time during which that did not unreasonably prolong the traffic stop.

    2.    Reasonable Suspicion

In the alternative, even presuming Officer Dunston's conduct expanded the scope and duration of the original purpose for the traffic stop, the extension can be justified if he has a reasonable, articulable basis for doing so. During his normal investigative procedures, Officer Dunston observed the passenger dip down in the seat. This conduct instantly led the officer to believe that the passenger was attempting to hide some form of contraband inside the vehicle and that criminal activity was afoot.

"[T]he Supreme Court has noted that 'reasonable suspicion' is a 'nontechnical conception[ ] that deal[s] with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" Branch, 537 F.3d at 336 (quoting Ornelas v. United States, 517 U.S. 690, 695, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996) (internal quotations omitted)).

> In order to demonstrate reasonable suspicion, a police officer must offer specific and articulable facts that demonstrate at least a minimal level of objective justification for the belief that criminal activity is afoot. Judicial review of the evidence offered to demonstrate reasonable suspicion must be commonsensical, focused on the evidence as a whole, and cognizant of both context and the particular experience of officers charged with the ongoing tasks of law enforcement.

Branch, 537 F.3d at 337 (quotations and citation omitted). The Court looks to the totality of the

circumstances in determining whether reasonable suspicion exists. See United States v. Arvizu, 534 U.S. 266, 273, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002). Importantly, "because the Terry reasonable suspicion standard is a commonsensical proposition, '[c]ourts are not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the street.'" United States v. Foreman, 369 F.3d 776, 782 (4th Cir. 2004) (quoting United States v. Lender, 985 F.2d 151, 154 (4th Cir.1993)); see also Branch, 537 F.3d at 336-37).

Here, Officer Dunston articulated that he saw the passenger dip down very low in the seat of the car as the officer's patrol car approached. Officer Dunston testified that based on his three years of training and experience with the police department conducting "hundreds" of traffic stops, he believed this activity to be very unusual and consistent with someone who possessed firearms or drugs. (Tr. p. 2). The Fourth Circuit has recognized that furtive or abrupt movement as officers approach is a relevant factor giving rise to reasonable suspicion. See United States v. Spearman, 254 F. App'x 178, 182 (4th Cir. 2007). In addition, Officer Dunston testified that Defendant failed to "keep good eye contact, and he was just looking away . . . looking around." (Tr. p. 23-24). Courts may also consider a suspect's evasive behavior in analyzing the existence of reasonable suspicion to believe that an individual is armed and dangerous. United States v. Griffin, 589 F.3d 148, 153 (4th Cir. 2009) (citing United States v. Mayo, 361 F.3d 802, 807-08 (4th Cir. 2004)).

Here, the Court finds Officer Dunston's basis for his suspicion that a firearm or drugs were present in the vehicle to be reasonable. The Court is also persuaded by the evidence that Officer Dunston's actions throughout the stop were consistent with his suspicion and demonstrate a diligent means of investigation to confirm his suspicion. After initiating the stop,

11

Officer Dunston quickly exited the vehicle and "didn't originally call the stop in in reference to seeing the movement in the vehicle." (Tr. p. 12). He testified, "The suspicious movement from the passenger made me get out of the car quickly to put eyes on the hands in the vehicle, just to make sure I could see what was going on in the vehicle." (Tr. p. 13). Officer Dunston also placed the microphone for the motor vehicle recorder down on the hood of his car as he approached the Cadillac, as opposed to placing the microphone in his uniform as he typically does in routine stops for traffic violations. (Tr. p. 29). Officer Dunston requested backup because of the "suspicious movement from the passenger" within the first two minutes of the traffic stop and while running a check on Defendant's driver's license and the passenger's identification. (Tr. p. 14).

In addition, Officer Dunston reasonably believed Defendant's driver's license to be suspended. Although the suspension of Defendant's license had been erroneously entered into the driver's license database, Officer Dunston could reasonably rely on the information provided to him via the North Carolina Department of Motor Vehicles database. Defendant's conduct protesting the status of his driver's license is not *per se* indicative of *evasive* behavior; however, at the time, Officer Dunston considered Defendant's elusive responses to be suspicious. At a minimum, Defendant's refusal to directly answer the officer's questions demonstrates Defendant's uncooperativeness with Officer Dunston's inquiry.

Officer Dunston had been questioning Defendant for less than four minutes when Defendant admitted that an unregistered firearm was in the vehicle. Officer Dunston then retrieved an assault rifle from the backseat. As the Court explained above, an officer that learns of the presence of a firearm may search the vehicle to secure that weapon. See Carico, 311 F.

Appx. at 574 (citing Elson, 479 F.3d at 320). After the officer obtained the firearm, he had reasonable suspicion to believe that the firearm might be evidence of criminal activity, particularly because Defendant had stated it was unregistered and because the passenger appeared to have suspiciously attempted to hide it. Thus, for the remainder of the stop until the time of Defendant's arrest, the officer could prolong the stop to verify the status of the firearm. Defendant was arrested within five minutes of Officer Dunston's confirmation that the gun was stolen.

Under the totality of the circumstances, the Court finds Officer Dunston's basis for his suspicion to provide "a minimal level of objective justification" to briefly prolong the stop in order to confirm or dispel his suspicions of criminal activity. Branch, 537 F.3d at 337.

### B. Probable Cause to Arrest

Even if this Court were to decide that the traffic stop unreasonably exceeded the lawful scope and duration, Officer Dunston was still permitted to detain Defendant because the officer had probable cause to arrest Defendant for a suspended license. See United States v. Lewis, No. 3:09-cr-93, 2010 WL 2629754, at *2 n. 2 (W.D.N.C. June 25, 2010) (finding the duration of the traffic stop after the police had probable cause to arrest irrelevant to the analysis of whether defendant was detained for an unreasonable amount of time for purposes of a routine traffic stop based on reasonable articulable suspicion), aff'd, 466 F. Appx. 170 (2012) (unpublished); United States v. Pettiford, 295 F. Supp. 2d 552, 559 (D. Md. 2003) (distinguishing between detention during a Terry stop and detention pursuant to a warrantless arrest based on probable cause).

Probable cause arises when sufficient facts and circumstances exist to warrant a prudent person to entertain a reasonable belief that the suspect was committing an offense. See Gerstein

v. Pugh, 420 U.S. 103, 111 (1975). Probable cause to make a custodial arrest can rest on trustworthy facts and information available to an officer, such that a prudent person would believe a law had been violated. See Beck v. Ohio, 379 U.S. 89, 91 (1964). Probable cause to arrest can exist even when the law believed to have been violated is a misdemeanor or other minor infraction, so long as such offense was committed in the arresting officer's presence. See, e.g., Virginia v. Moore, 553 U.S. 164, 167, 176 (2008) (finding arrest for driving on suspended license did not violate Fourth Amendment, even though state law required issuance of summons and did not authorize arrest); Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.").

Although it was later revealed to be a computer error, it is uncontested that Defendant's driver's license had the status of "suspended" at the time of the traffic stop. It is also undisputed that driving with a suspended license is an arrestable offense. As explained above, the erroneous reading on the driver's license database system was a mistake in fact, not a mistake in law. Defendant has not shown Officer Dunston's reliance on the North Carolina Driver's License System to be unreasonable. The Court finds that Officer Dunston had probable cause to arrest Defendant for driving with a suspended license for failure to appear in court.

The Supreme Court has explained that an officer is permitted to conduct a protective search of a vehicle in effectuating an arrest. In Davis v. United States, the Court explained the "new, two-part rule" set forth in Arizona v. Gant, 556 U.S. 332, 346-47, 129 S. Ct. 1710, 1721, 173 L. Ed. 2d 485 (2009), stating that "an automobile search incident to a recent occupant's

arrest is constitutional (1) if the arrestee is within reaching distance of the vehicle during the search, or (2) if the police have reason to believe that the vehicle contains 'evidence relevant to the crime of arrest.'" Davis v. United States, 131 S. Ct. 2419, 2425, 180 L. Ed. 2d 285 (2011) (quoting Gant, 129 S. Ct., at 1719 (citing Thornton v. United States, 541 U.S. 615, 632, 124 S. Ct. 2127, 158 L. Ed. 2d 905 (2004) (SCALIA, J., concurring in judgment); internal quotation marks omitted)). "These exceptions together ensure that officers may search a vehicle when genuine safety or evidentiary concerns encountered during the arrest of a vehicle's recent occupant justify a search." Gant, 556 U.S. at 347.

Even though no arrest is made, an officer may still be justified in conducting a search of the vehicle. "Where no arrest is made, we have held that officers may search the car if they reasonably believe 'the suspect is dangerous and . . . may gain immediate control of weapons.' In the no-arrest case, the possibility of access to weapons in the vehicle always exists, since the driver or passenger will be allowed to return to the vehicle when the interrogation is completed." Gant, 556 U.S. at 352 (SCALIA, J., concurring in judgment) (quoting Michigan v. Long, 463 U.S. 1032, 1049, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983)). The Fourth Circuit has repeatedly recognized that a search is justified when the suspect may return to the vehicle to gain access to the weapon. See United States v. Griffin, 589 F.3d 148, 154 (4th Cir. 2009) (finding a brief protective search of the vehicle proper because "[i]f [the defendant] had been released after the brief detention, as he presumably would have been, he would have regained access to his vehicle and any weapon inside.") (citing United States v. Elston, 479 F.3d 314, 320 (4th Cir. 2007) ("[A] protective search is authorized even if the suspect is under police restraint at the time the search is conducted, because the suspect may be able to escape such restraint, or may later regain access

to the vehicle if he is not arrested.")).

The searches permitted for officer safety are based on the rationale that an unsecured recent occupant of a vehicle "can be a real, potential threat to police officers in the present . . . ." United States v. Parson, No. 3:09–CR–377, 2010 WL 1417850, at *2 (E.D. Va. April 6, 2010). In addition, as already discussed in this Order, the Fourth Circuit has recognized that if an officer, either by observing it in plain view or by disclosure by an occupant of the vehicle, discovers existence of a firearm, then the officer is permitted to search the vehicle to secure the weapon. See Carico, 311 F. Appx. at 574.

Here, neither party argues that Officer Dunston conducted the vehicle search to find evidence relevant to the crime of arrest – driving with a suspended license. Thus, the second prong of Gant is inapplicable under these facts. See Davis, 131 S. Ct. at 2425 (quoting Gant, 129 S. Ct. at 1719). Instead, Officer Dunston conducted the search because Defendant – and the passenger – were both within reaching distance of the vehicle during the search and because the passenger was not being placed under arrest.

Although Officer Dunston testified that he intended to arrest Defendant for driving with a suspended license, Defendant was not immediately placed under arrest nor was his freedom significantly curtailed during the time Officer Dunston questioned him or searched the vehicle. For the duration of the stop, Defendant was unsecured standing behind the vehicle, was free to move around the vehicle, was engaging in conversation with the passenger, and, at one point, was making a call from his cell phone, as see on the video. In addition, the passenger was never placed under arrest, and at the time of Defendant's arrest, the passenger was free to return to the vehicle. The officer also permitted Defendant to call a friend to come retrieve the vehicle, thus

presenting the possibility of another person who could potentially gain access to a weapon. Notably, the video from Officer Dunston's car also reveals several children playing on the street, just a short distance from where Defendant stopped his vehicle, as well as people walking on the sidewalk by the stopped vehicle. Based on Officer Dunston's prior observation of the passenger dipping low in the seat, Officer Dunston had legitimate safety concerns to support a search of the vehicle. Thus, from around 9:00 p.m, when Officer Dunston learned that Defendant's license was suspended until he was placed under arrest at 9:22 p.m., Defendant and the passenger were briefly and reasonably detained, under Terry, while Officer Dunston conducted the protective vehicle search.

Officer Dunston's protective search is justified for two reasons. Foremost is Defendant's admission that a firearm was located in the vehicle. United States v. Goode, 178 F. App'x 219, 221 (4th Cir. 2006) ("Goode's pre-custodial admission that a firearm was located in his vehicle created a reasonable, articulable suspicion that he presented a danger to the officers, which justified their decisions to place him in handcuffs, see United States v. Moore, 817 F.2d 1105, 1108 (4th Cir. 1987) (holding a brief but complete restriction of liberty is valid under Terry), and to conduct their search of the areas of the passenger compartment of the automobile where "a weapon may be placed or hidden." Long, 463 U.S. 1032. Finding the firearm and narcotics, the officers possessed probable cause to arrest Goode. Finding no violation of the Fourth Amendment, we therefore conclude that the district court correctly denied Goode's suppression motion."). In addition, the suspicious activity of the passenger and Defendant as discussed in the above section on reasonable suspicion also supports a protective vehicle search. See United States v. Hassan El, 5 F.3d 726, 731 (4th Cir. 1993) ("Officer Fabula testified that Hassan El

17

appeared nervous and that he saw Hassan El's hands moving toward a bulge in his waistband. Officer Fabula also spoke of his concern for his safety and that of his fellow officers. The district court credited the officer's story, and its finding is not clearly erroneous. Based on the officer's testimony of the critical events, we agree with the district court that the search of Hassan El and the removal of the gun clearly were proper.").

To some extent, Defendant argues that his admission as to the firearm violates his constitutional rights. Even presuming Defendant was in custody at the time he admitted to having a firearm, Defendant's admission falls within the public safety exception to Miranda. Even if a defendant is in custody for purposes of Miranda, the public safety exception to the Miranda requirement permits pre-Miranda questioning at the scene regarding matters relevant to the safety of police or members of the public. New York v. Quarles, 467 U.S. 649, 655-56, 104 S. Ct. 2626, 81 L. Ed. 2d 550 (1984) (admitting statement made by a defendant arrested in a supermarket and wearing an empty shoulder harness); accord United States v. Mobley, 40 F.3d 688, 692-93 (4th Cir.1994) (expressly recognizing the exception in the Fourth Circuit). The public safety exception is narrowly construed and is applicable only when there is an objectively reasonable need to protect against public danger. See Quarles, 467 U.S. at 656, 658, 104 S. Ct. 2626; Mobley, 40 F.3d at 692. The exception "is usually applied where a police officer has asked a suspect if the suspect is carrying a firearm." Elizabeth Williams, Annotation, Post–Quarles Cases, 142 A.L.R. Fed. 229, § 2[a] (2004).

Here, undisputed video evidence indicates children and adults alike in the street of a residential neighborhood near where Officer Dunston pulled over Defendant's vehicle. It is fair to say that Officer Dunston's concern for the safety of himself arising out of the suspicious

behavior of the passenger and Defendant also includes the concern for the safety of those nearby. The Court finds this to be an objectively reasonable concern about immediate danger to the officers and innocent bystanders that justifies his limited inquiry regarding the presence of weapons.

### C. Subsequent Statements and Evidence

The Court has concluded the traffic stop, roadside questioning, search of the car, and arrest of Defendant were lawful. The Court has also concluded that Defendant was not under arrest at the time he responded to Officer Dunston's questioning about a firearm in the vehicle. Therefore, Defendant's statements made at the scene do not violate Miranda v. Arizona, 384 U.S. 444 (1966).

Following Defendant's arrest, he was informed of and waived his rights by signing a written waiver. Defendant admitted to possessing the rifle for the purpose of selling it for a friend. Any statements made post-arrest occurred after Defendant knowingly and voluntarily waived his rights at the law enforcement center where he was interviewed following his arrest. Therefore, his statements are admissible.

## III. Conclusion

In sum, the Court concludes that Officer Dunston did not unreasonably extend the scope or the duration of the traffic stop, and if he did, he had reasonable suspicion of criminal activity to prolong the stop. In the alternative, Officer Dunston had probable cause to arrest Defendant for driving with a suspended license, and as a result, was lawfully permitted to search the backseat of the vehicle where he located the firearm.

IT IS THEREFORE ORDERED that Defendant's Motion to Suppress (Doc. No. 10) is DENIED.

IT IS SO ORDERED.

Signed: May 28, 2013

Frank D. Whitney
United States District Judge